# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| **SANTO'S ITALIAN CAFÉ LLC dba SANTOSUOSSOS PIZZA PASTA VINO** | **CASE NO. 1:20-cv-01192** |
| **Plaintiff,** | **JUDGE PAMELA A. BARKER** |
| **-vs-** | |
| **ACUITY INSURANCE COMPANY,** | **MEMORANDUM OF OPINION AND ORDER** |
| **Defendant.** | |

This matter comes before the Court upon the Motion to Dismiss Plaintiff's Complaint, filed by Defendant Acuity Insurance Company ("Acuity") on June 19, 2020.  (Doc. No. 7.)  Plaintiff Santo's Italian Café LLC dba Santosuossos Pizza Pasta Vino ("Santo's") filed a Brief in Opposition to Defendant Acuity's Motion on September 11, 2020.  (Doc. No. 13.)  Defendant Acuity filed a Reply in Support of its Motion on September 25, 2020.  (Doc. No. 14.)

For the following reasons, Acuity's Motion to Dismiss (Doc. No. 7) is GRANTED.

## I.      Background

### A.      Allegations Set Forth in the Complaint

Plaintiff Santo's Complaint stems from losses it suffered as a result of the global COVID-19 pandemic.  (Doc. No. 1-1, ¶ 1.)  Santo's operates a restaurant and bar in Medina, Ohio.  (*Id.*)  Santo's derives its primary source of revenue from customers who dine inside the restaurant during regular business hours, compared to customers who call the restaurant to place take-out orders.  (Doc. No. 1-1, ¶ 1.)  It has been forced, by recent orders by the State of Ohio, to cease its dine-in operations—

through no fault of its own—as part of the State's efforts to slow the spread of the COVID-19 global pandemic.  (*Id.*)

On March 9, 2020, Governor Mike DeWine issued Executive Order 2020-01D Declaring a State of Emergency in Ohio.  (Doc. No. 1-1, ¶ 3.)   On March 11, 2020, the head of the World Health Organization declared COVID-19 a pandemic.  (Doc. No. 1-1, ¶ 4.)  On March 15, 2020, Governor DeWine and Amy Acton, M.D., M.P.H., Director of the Ohio Department of Health, issued a Public Health Order closing all bars and restaurants, except sales of carry-out beverages and food, in an effort to address the ongoing COVID-19 pandemic.  (Doc. No. 1-1, ¶ 5.)  On March 17, 2020 and March 20, 2020, Governor DeWine and Dr. Acton issued orders closing all polling locations and ceasing business operations at all hair salons, day spas, nail salons, barber shops, tattoo parlors, body piercing locations, tanning facilities and massage therapy locations.  (Doc No. 1-1, ¶¶ 6,7.)  On March 22, 2020 Governor DeWine and Dr. Acton issued an order that all persons stay at home unless engaged in essential work or activity.  (Doc. No. 1-1, ¶ 8.)  As a result of these orders identified in paragraphs 3 and 5-8 of the Complaint ("the Closure Orders"), Santo's was "forced to halt ordinary operations, including all dine-in operations which operations provide a substantial majority of its revenue, resulting in substantial lost revenues and forcing [Santo's] to shut down dine-in operations and lay off employees."  (*Id.* at ¶ 9.)

Santo's obtained business interruption insurance from Defendant Acuity through Santo's insurance agent, The Fedeli Group.  (Doc. No. 1-1, ¶¶ 1, 12.)  Acuity issued Santo's a "Bis-Pak Business Policy," numbered L59702[1], effective from April 21, 2019 to April 21, 2020.  (*Id.* at ¶¶ 18, 19.)

---

[1] Santo's did not attach a copy of its Policy to its Complaint.  However, Acuity attached as Exhibit F, the applicable policy it issued to Santo's to its Motion to Dismiss.  (*See* Doc. No. 7-7.)  In ruling on a Rule 12(b)(6) motion, a court "may

Santo's alleges that the Closure Orders were issued because of property damage caused by the Covid-19 infection and global pandemic, and in response to dangerous physical conditions resulting from the Covid-19 infection and global pandemic.  (*Id.* at ¶ 16.)  According to Santo's, the "all risk" or "special perils" policy that Acuity sold to it in exchange for substantial premiums, indemnifies it for "actual loss of Business Income" Santo's sustains, as well as "necessary Extra Expense" caused by "action of civil authority that prohibits access to the described premises"; it does not exclude for losses of business income as a result of the property damage occasioned in Plaintiff's premises caused by, or as a result of compliance with government orders as a result of, the COVID-19 infection and/or a global pandemic.  (*Id.* at ¶¶ 18, 21-24.)  Further, Santo's alleges that "[i]n addition to property damage losses, Acuity agreed to "pay for the actual loss of Business Income" sustained by it "due to the necessary suspension" of Santo's operations during the period of business interruption caused "by direct physical loss of or damage to property" at its premises, and Acuity promised to pay "necessary Extra Expense" incurred during the interruption period that Santo's "would not have incurred if there had been no direct physical loss or physical damage to property at" its premises.  (*Id.* at ¶¶ 25, 26.)

---

consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett* 528 F.3d at 430.  Here, Santo's cites, references and discusses the applicable policy attached to Acuity's Motion to Dismiss in its Complaint.  (Doc. No. 1-1.)  Further, Santo's does not dispute that the policy, and specifically the terms and conditions of the Property Coverage Form is central to its claims.  The Court finds that it may consider the policy, and specifically the relevant language of the Property Coverage Form attached to Acuity's Motion to Dismiss without converting it to a summary judgment motion because Santo's expressly references the Property Coverage Form in its Complaint.  *Bassett*, 528 F.3d at 430 ("When a court is presented with a Rule 12(b)(6) motion, it may consider the Complaint and any exhibits attached thereto . . . and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein.") (citing *Amini*, 259 F.3d at 502). *See also Northampton Restaurant Group, Inc. v. FirstMerit Bank, N.A.*, 492 Fed. App'x 518, 521-22 (6th Cir. 2012) (same).

3

Santo's alleges that research on COVID-19 and recent CDC reports indicate that COVID-19 physically infect[s] and can remain viable on surfaces for at least 17 days, a characteristic that renders property exposed to the contagion potentially unsafe and dangerous and that it can linger on surfaces for up to four weeks in low temperatures.  (*Id.* at ¶ 28.)  In its Complaint, Santo's does not allege that COVID-19 was actually found in or on its premises, but alleges that "[t]he continuous presence of the pandemic and COVID-19 contagion resulted in the Closure Orders which themselves have mandated that Plaintiff's premises is unsafe, dangerous and unfit for **its intended <u>use</u> and therefore caused direct physical property damage or physical loss under the [Acuity] Policy**."  ((Emphasis added.)  *Id.* at ¶ 31.)  According to Santo's, the Closure Orders caused the necessary suspension of its dine-in business operations and triggered the Civil Authority coverage under the Acuity Policy and caused it to suffer substantial Business Income loss and to incur Extra Expense.  (*Id.* at ¶ 32.)

Santo's alleges that it informed its agent at The Fedeli Group of a claim under the Property Coverage Form's Business Income and Extra Expense provision, as well as the Civil Authority provision.  (*Id.* at ¶¶ 32-34.)  However, Santo's alleges that it "was told that Acuity would not be paying such claims because the pandemic was an 'act of God.'"  (*Id.*)  Santo's alleges that Acuity denied its claim because the "pandemic was an 'act of God.'"  (*Id.* at ¶ 36.)

Santo's Complaint sets forth three causes of action.  In Count I, Santo's seeks a declaratory judgment that its losses incurred in connection with the Closure Orders and the necessary interruption of its businesses stemming from the COVID-19 pandemic are insured losses under the Acuity policy, requiring Acuity to pay it the full amount of its losses, to include losses related to any future orders by Governor DeWine and the Ohio Department of Health, and there is no exclusion in the policy that applies to preclude its claim.  (*Id.* at ¶ 43.)  In Count II, Santo's asserts a breach of contract claim

against Acuity because it denied coverage for its claim/losses.  (*Id.* at ¶¶ 44-51.)  In Count III, Santo's

asserts a breach of the duty of good faith and fair dealing.  (*Id.* at ¶¶ 52-57.)

The Acuity Policy is comprised of several forms and endorsements, including the "Deluxe

Bis-Pak Property Coverage Form," number CB-0002(8-15) ("the Property Coverage Form"), which

contains the relevant provisions at issue in this matter or applicable to the parties' dispute regarding

coverage.  (Doc. No. 7-7, PageID# 125-51.)  The insuring agreement of the Property Coverage Form

reads as follows:

> We will pay for **direct physical loss of or damage to** Covered Property at the
> premises described in the Declarations caused by or resulting from any **Covered
> Cause of Loss.**

((Emphasis added.) *Id.* at PageID# 126.)  The term "Covered Cause of Loss" as used in the Property

Coverage Form is defined in relevant part as "Risks of **Direct Physical Loss** unless the loss is:  a.

Excluded in Property Exclusions.  ((Emphasis added.)  *Id.* at PageID# 127.)  The "Property

Definitions" set forth at pages 25 and 26 of the Property Coverage Form and applicable thereto do

not include a definition of the phrase "direct physical loss of or damage to" as that phrase is used in

the Property Coverage Form insuring agreement, and in the Business Income and Extra Expense

provisions of the Property Coverage Form, pursuant to which Santo's seeks indemnification for its

business income losses, business interruption and extra expense.  Moreover, the "Property

Definitions" do not include a definition of "Direct Physical Loss" as that phrase is used in the

"Covered Cause of Loss" definition.  The "Property Definitions" do not include any definitions of

the words "direct", "physical", "loss", or "damage".

The Business Income and Extra Expense coverage provisions are set forth in subsection g.

under "5. Additional Coverages", and read in relevant part as follows:

5

**g. Business Income and Extra Expense**

(1) We will pay for the actual loss of Business Income you sustain due to the necessary suspension of your *operations* during the *period of restoration*.  The suspension must be caused by **direct physical loss of or damage to property** at the described premises.  **The loss or damage must be caused by or result from a Covered Cause of Loss**….

…

(3) We will pay necessary Extra Expense you incur during the *period of restoration* that you would not have incurred if there had been no **direct physical loss or damage to property** at the described premises.  The loss or damage must be caused by or result from a Covered Cause of Loss.

…

(4) Extra Expense means expense incurred:

(a) To avoid or minimize the suspension of business and to continue *operations*:

(i) At the described premises; or

(ii) At replacement premises or at temporary locations, including relocation expenses, and costs to equip and operate the replacement or temporary locations.

(b) To minimize the suspension of business if you cannot continue *operations*.

(c) To:

(i) Repair or replace any property; or

(ii) Research, replace or restore the lost information on damaged *valuable papers and records*:

To the extent it reduces the amount of loss that otherwise would have been payable under the Additional Coverage.

(5) We will only pay for Loss of Business Income or Extra Expense that you sustain during the *period of restoration* and that occurs within 12 consecutive months after the date of direct physical loss or damage.  Items (1) through (5) of this Additional Coverage are not subject to the Limits of Insurance.

…

((Emphasis added.)  Doc. No. 7-7, PageID# 130-31.)

The terms "*operations*" and "*period of restoration*" are defined in the "Property Definitions"

section as follows:

8. "*Operations*" mean your business activities occurring at the described premises.

6

9. "*Period of restoration*" means the period of time that:
    a. Begins:
        (1) 24 hours after time of **direct physical loss or damage** for Business Income coverage; or
        (2) Immediately after the time of **direct physical loss of damage** for Extra Expense coverage;
    **Caused by or resulting from any Covered Cause of Loss** at the described premises; and
    b. Ends on the earlier of:
        (1) The date when the property at the described premises should be **repaired, rebuilt or replaced** with reasonable speed and similar quality; or
        (2) The date when business is resumed at a new permanent location.
*Period of restoration* does not include any increased period required due to the enforcement of any ordinance of law that:
    a. Regulates the construction, use or repair, or requires the tearing down of any property; or
    b. Requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize or in any way respond to or assess the effects of *pollutants*.
The expiration date of this policy will not cut short the *period of restoration*.

((Emphasis added.)  *Id*. at PageID# 151.)

The Civil Authority coverage provisions are set forth in subsection h. under "5. Additional Coverages."  They read in relevant part as follows:

> **h. Civil Authority**
> When a **Covered Cause of Loss causes damage to property** other than property at the described premises, we will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises, provided that both of the following apply:
>
> (1) Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage, and the described premises are within that area; and
> (2) The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property. . . . .

(Doc. No. 7-7, PageID# 131-32, and endorsement CB-7410 (8-15), PageID # 176.)

The "Property Exclusions" set forth under and applicable to the Property Coverage Form include an exclusion for damage caused directly or indirectly by viruses or bacteria, to wit:

> 1. We will not pay for loss or damage caused directly or indirectly by any of the following.  Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.  These exclusions apply whether or not the loss event results in widespread damage or affects a substantial area.
> . . .
> **i. Virus Or Bacteria**
> (1) Any virus, bacterium, or other microorganism that induces or is capable of inducing physical distress, illness or disease. . . .

(*Id.*, PageID# 139-40.)

**B.      Procedural History**

On April 24, 2020, Santo's filed a Complaint in the Court of Common Pleas of Cuyahoga County, Ohio against Acuity.  (Doc. No. 1.)  On May 29, 2020, Acuity removed this action to this Court, pursuant to 28 U.S.C. § 1441, as complete diversity of citizenship exists between Santo's and Acuity, and the amount in controversy exceeds $75,000, pursuant to 28 U.S.C. § 1331(a)(1).  (Doc. No. 1, PageID# 2.)

Acuity filed a Motion to Dismiss Santo's Complaint on June 19, 2020 ("Acuity's Motion"). (Doc. No. 7.)  On July 14, 2020, Santo's moved for an extension of time to file an Opposition to Acuity's Motion to Dismiss, pending multidistrict litigation consolidation efforts regarding various COVID-19 insurance coverage disputes.  (Doc. No. 8.)  The Court granted Santo's motion on July 15, 2020.

On August 10, 2020, Acuity filed a Supplemental Authority in Favor of its Motion to Dismiss.  (Doc. No. 10.)  On August 20, 2020, Acuity filed a Notice that the Judicial Panel on Multidistrict Litigation rejected the consolidation of an industry-wide COVID-19 insurance coverage

8

MDL dispute.  (Doc. No. 11.)  On August 21, 2020, Santo's moved for, and received, another extension to file its Opposition to Acuity's Motion to Dismiss.  (Doc. No. 12.)  On September 11, 2020, Santo's filed a Response in Opposition to Acuity's Motion ("Santo's Opposition"). (Doc. No. 13.)  Acuity filed a Reply in Support of its Motion to Dismiss on September 25, 2020 ("Acuity's Reply").  (Doc. No. 14.)  Thus, on September 25, 2020, Acuity's Motion to Dismiss became ripe for a decision.

After Acuity's Motion to Dismiss became ripe, Santo's filed several Supplemental Authorities in Support of its Opposition to Acuity's Motion to Dismiss on: October 6, 2020 (Doc. No. 15); October 20, 2020 (Doc. No. 17); November 17, 2020 (Doc. No. 19); and December 3, 2020 (Doc. No. 21).  Acuity filed a Response to each of Santo's Supplemental Authorities on:  October 12, 2020 (Doc. No. 16); October 23, 2020 (Doc. No. 18); November 24, 2020 (Doc. No. 20); and December 4, 2020 (Doc. No. 22).

## II.     Acuity's Motion to Dismiss

### A.     Legal Standard

Acuity moves to dismiss Santo's Complaint for failure to state a claim under Fed. R. Civ. P. 12(b)(6).  Under Fed. R. Civ. P. 12(b)(6), the Court accepts the plaintiff's factual allegations as true and construes the Complaint in the light most favorable to the plaintiff.  *See Gunasekara v. Irwin*, 551 F.3d 461, 466 (6th Cir. 2009).  In order to survive a motion to dismiss under this Rule, "a complaint must contain (1) 'enough facts to state a claim to relief that is plausible,' (2) more than 'formulaic recitation of a cause of action's elements,' and (3) allegations that suggest a 'right to relief above a speculative level.'"  *Tackett v. M & G Polymers, USA, LLC*, 561 F.3d 478, 488 (6th Cir.

2009) (quoting in part *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-56, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).

The measure of a Rule 12(b)(6) challenge—whether the Complaint raises a right to relief above the speculative level—"does not 'require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face.'" *Bassett v. National Collegiate Athletic Ass'n.*, 528 F.3d 426, 430 (6th Cir. 2008) (quoting in part *Twombly*, 550 U.S. at 555-56, 127 S.Ct. 1955).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).  Deciding whether a complaint states a claim for relief that is plausible is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

Consequently, examination of a complaint for a plausible claim for relief is undertaken in conjunction with the "well-established principle that 'Federal Rule of Civil Procedure 8(a)(2) requires only a short and plain statement of the claim showing that the pleader is entitled to relief.'  Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Gunasekera*, 551 F.3d at 466 (quoting in part *Erickson v. Pardus*, 551 U.S. 89, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007)) (quoting *Twombly,* 127 S.Ct. at 1964).  Nonetheless, while "Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal,* 556 U.S. at 679, 129 S.Ct. 1937.

### B.      Analysis

Acuity seeks to dismiss Santo's Complaint for two overarching reasons.  First, Acuity argues that the Property Coverage Form does not provide any coverage for the financial losses Santo's alleges it incurred due to the Closure Orders and the general economic downturn caused by the COVID-19 pandemic.  Acuity asserts that in its Complaint, Santo's does not plausibly allege that the Closure Orders or pandemic resulted in any sort of direct physical loss to, direct physical loss of, or damage to, its property, i.e, what it argues Ohio law dictates means physical, structural or tangible damage or loss to property, to state a threshold claim for Business Income, Extra Expense, or Civil Authority coverage under the Property Coverage Form.  Acuity argues that Santo's must plead direct physical loss or damage to its property to trigger coverage under the Property Coverage Form and its failure to do so is fatal to its claims.  Stated differently, Acuity argues that direct physical loss to, direct physical loss of, or damage to Santo's property or covered premises does not mean a loss of use of its covered premises, i.e., its dine-in operations, substantial, partial, or otherwise.     Second, Acuity argues that, even if Santo's Complaint can be evaluated or interpreted as alleging that the Closure Orders resulted in direct physical damage or loss to the Covered Premises, the Property Coverage Form contains a broad virus exclusion that applies to the COVID-19 pandemic, precluding coverage to Santo's.

In its Response to Acuity's Motion to Dismiss, and citing to its Complaint, Santo's in effect and correctly asserts that its Complaint includes the allegation that it "suffered direct physical loss **of the use of its property** as result of the pandemic and government closure orders that made its property uninhabitable and/or unusable for its intended business operation."  ((Emphasis added.) Doc. No. 13, PageID # 272.)  Santo's also in effect and correctly asserts that its Complaint includes the allegations

that the "continuous presence of the pandemic and COVID-19 contagion, that resulted in the Closure Orders "mandate[] that Santo's premises is unsafe, dangerous and unfit **for its intended use**," and "[a]s such, the COVID-19 contagion and pandemic caused direct physical property damage or physical loss of Santo's property."  (Doc. No. 13, PageID # 275.)  And, Santo's reasserts what it alleged in its Complaint, i.e., that it "suffered substantial business income loss and incurred extra expense as a result of the pandemic and Closure Orders."  (*Id.*)  Santo's also argues that the virus exclusion is ambiguous because it does not clearly intend to exclude losses as a result of Closure Orders due to a pandemic and therefore, it does not apply to preclude coverage to it.

### 1.    Interpretation of Insurance Contracts Under Ohio Law

Acuity removed this matter on the basis of diversity jurisdiction under 28 U.S.C. § 1332(a)(1). Specifically, complete diversity of citizenship exists between Santo's, a citizen of Ohio, and Acuity, a Wisconsin corporation with its principal place of business in Wisconsin, and the amount in controversy is greater than $75,000.  (Doc. No. 1.)  Moreover, the policy declarations state that Santo's insured premises are located in Ohio.  (Doc. No. 7-7, PageID# 105.)  Therefore, Ohio law applies. *See, e.g., Ohayon v. Safeco Ins. Co. of Ill.*, 91 Ohio St.3d 474, 479 (Ohio 2001).  Accordingly, the Court will briefly address the general principles governing the interpretation of insurance contracts under Ohio law.  These principles will inform the Court's subsequent analysis of the parties' arguments.    Under Ohio law, "[a]n insurance policy is a contract whose interpretation is a matter of law." *Sharonville v. Am. Employers Ins. Co.*, 846 N.E.2d 833, 836 (Ohio 2006) (*citing Alexander v. Buckeye Pipe Line Co*., 374 N.E.2d 146, 150 (Ohio 1978)).  A court "examine[s] the insurance contract as a whole and presume that the intent of the parties is reflected in the language used in the policy." *Westfield Ins. Co. v. Galatis*, 797 N.E.2d 1256, 1261 (Ohio 2003).

12

"Simply because a term in a contract is not defined does not mean that the policy is ambiguous." *Penton Media, Inc. v. Affiliated Fm Ins. Co.*, No. 1:03-cv-2111, 2005 WL 8171363, at *6 (N.D. Ohio Sept. 30, 2005) (citing *Chicago Title Ins. Co. v. Huntington Nat'l Bank*, 719 N.E.2d 955, 959 (Ohio 1999)). Rather, a court must "look to the plain and ordinary meaning of the language used in the policy unless another meaning is clearly apparent from the contents of the policy." *Westfield Ins. Co.*, 797 N.E.2d at 1261. "When the language of a written contract is clear, a court may look no further than the writing itself to find the intent of the parties. . . . As a matter of law, a contract is unambiguous if it can be given a definite legal meaning." *Id.*

On the other hand, if a contract is ambiguous, "a court may consider extrinsic evidence to ascertain the parties' intent." *Id.* A court may not "alter a lawful contract by imputing an intent contrary to that expressed by the parties." *Id.* at 1261-62. In the insurance context, "[i]f provisions are susceptible of more than one interpretation, they 'will be construed strictly against the insurer and liberally in favor of the insured.'" *Sharonville*, 846 N.E.2d at 836 (quoting *King v. Nationwide Ins. Co.*, 519 N.E.2d 1380, syllabus (Ohio 1988)). "Additionally, 'an exclusion in an insurance policy will be interpreted as applying only to that which is *clearly* intended to be excluded.'" *Id.* (quoting *Hybud Equip. Corp. v. Sphere Drake Ins. Co., Ltd.* 597 N.E.2d 1096, 1102 (Ohio 1992)).

This rule has limitations. While an insurance policy that is "reasonably open to different interpretations will be construed most favorably for the insured, that rule will not be applied so as to provide an unreasonable interpretation of the words of the policy." *Westfield Ins. Co.*, 797 N.E.2d at 1261 (quoting *Morfoot v. Stake*, 190 N.E.2d 573, syllabus (Ohio 1963)).

### 2.  Threshold Claim for Business Income and Extra Expense Coverage

The parties dispute whether Santo's allegations establish the threshold "direct physical loss of or damage to property at the insured premises" required by the Property Coverage Form. Specifically, the parties dispute the definition of "direct physical loss of or damage to" under the Property Coverage Form.  Acuity argues that Santo's fails to plead harm that meets the Property Coverage Form's threshold of "direct physical loss of or damage to property," as the phrase is construed under Ohio law.  (Doc. No. 7-1, PageID# 48-49.)  Therefore, Acuity argues, Santo's entire Complaint must be dismissed because Santo's cannot make out a threshold claim for coverage.  (*Id.*) According to Acuity, Ohio case law construes "direct physical loss of or damage to" to mean "distinct, demonstrable, physical alteration" of insured property.  (*Id.*)  Acuity argues that Santo's pleads no such tangible alteration of its property, but merely pleads the general existence of COVID-19 and the Closure Orders, neither of which physically altered Santo's property.  (*Id.* at PageID# 51.)  Acuity also argues its interpretation that "direct physical loss" requires physical alteration of the property is further buttressed by Property Coverage Form language discussing a "period of restoration" after a direct physical loss.  (*Id.* at PageID# 52.)  Moreover, Acuity argues that Santo's does not allege the presence of COVID-19 on its premises and that, even if it had, a virus damages human tissue, not inanimate objects like restaurant buildings, tables, and ovens.  (*Id.*)  Finally, Acuity argues that the Closure Orders did not inflict physical damage on Santo's premises, but only prevented Santo's from conducting on-site dining operations.  (*Id.* at PageID# 53.)

Santo's responds that, first and foremost, Acuity attempts to transform its Motion to Dismiss into a Motion for Summary Judgment.  (Doc. No. 13, PageID# 281-82.)  Next, Santo's argues that insurance contracts are contracts of adhesion and so the Court must resolve any ambiguity in the

Property Coverage Form's terms in favor of Santo's, not Acuity.[2]  (*Id.* at PageID# 285.)  Santo's argues that Acuity's interpretation of "direct physical loss of or damage to" is too narrow and is also contrary to the plain, reasonable, and intended language of the Property Coverage Form.  (*Id.* at PageID# 290.)

Santo's further argues that "direct physical loss of or damage to" contains two separate bases for coverage.  Santo's argues that "direct physical loss of" insured property should be read as an additional basis for coverage beyond "damage to" insured property because these phrases are stated in the disjunctive (i.e., separated by "or").  (*Id.*)  According to Santo's, Acuity ignores this "physical loss" basis for coverage.  (*Id.*)  Santo's argues that "physical loss" cannot *also* mean "damage," otherwise either "loss" or "damage" would be ignored as mere surplusage.  (*Id.* at PageID# 291.)

According to Santo's, because the Property Coverage Form contemplates coverage for either "physical loss" *or* "damage," Santo's need not plead that it has suffered *structural damage* because it pleaded *loss* of **use** of its premises as a result of the State's Closure Orders.  ((Emphasis added.) *Id.* at PageID# 291-95.)  To support this argument, Santo's cites nearly two dozen non-Ohio cases for the proposition that "the majority of courts nationwide agree that physical 'loss' does not require structural damage," but that "lost operations or inability to use the business is sufficient."  (*Id.* at PageID# 292.)  Santo's emphasizes that the loss **of functionality** also constitutes loss.  ((Emphasis added.) *Id.* at PageID# 293.)

---

[2] The Court notes that in Santo's Opposition, many of Santo's arguments about the definition of "physical loss of or damage to" are found under the subheading "The Civil Authority Orders Were Issued as a Result of Damage to Property." (Doc. No. 13, PageID# 290-96.)  Nevertheless, many of the arguments under this subheading address the issue of threshold coverage under the Property Coverage Form and the interpretation of the phrase "physical loss of or damage to" as found in the opening of the Property Coverage Form, in subsection g, "Business Income and Extra Expense," and in subsection h, "Civil Authority."  The Court construes Santo's arguments to apply with equal force to the questions of threshold coverage under both the Business Income and Extra Expense provision, as well as the Civil Authority provision.

15

Further, Santo's argues that Acuity's "strained interpretation" of "direct physical loss of or damage to" adds in words that do not exist in the Property Coverage Form, such as "tangible," "structural," and "structural integrity."  (*Id.* at PageID# 292.)  Santo's argues that if this provision is clear and unambiguous, Acuity would not need to add words to the provision that do not exist in the Property Coverage Form.  (*Id.*)  Alternatively, if the Property Coverage Form is ambiguous, then the provision should be interpreted in favor of Santo's, not Acuity.  (*Id.*)

The Court finds that Santo's fails to plead a threshold claim of "direct physical loss of or damage to" its insured premises, and therefore, Santo's claim for Business Income and Extra Expense coverage fails.  The Court begins its analysis by examining the language of the Property Coverage Form.  The Property Coverage Form does not define "direct physical loss of or damage to" insured property.  However, "[s]imply because a term in a contract is not defined does not mean that the policy is ambiguous."  *Penton Media, Inc.*, 2005 WL 8171363, at *6.  When an insurance contract does not define a term, the Court looks to "the plain and ordinary meaning of the language used in the policy unless another meaning is clearly apparent from the contents of the policy."  *Westfield Ins. Co.*, 797 N.E.2d at 1261.

Because Santo's insured premises are located in Ohio, and because this matter comes before this Court under diversity jurisdiction, the Court applies Ohio law in its interpretation of the Property Coverage Form at issue here.  *See, e.g., Ohayon*, 91 Ohio St.3d at 479.  (*See also* Doc. No. 7-7, PageID# 105.)  The Ohio Court of Appeals addressed the plain and ordinary meaning of a similar term, "physical injury," in *Mastellone v. Lightning Rod Mut. Ins. Co.*  The *Mastellone* court construed the "plain and ordinary meaning" of the term "physical injury" within a homeowner insurance policy "to mean a harm to the property that adversely affects the structural integrity of the house."

16

*Mastellone v. Lightning Rod Mut. Ins. Co.*, 175 Ohio App. 3d 23, 40 (Ohio 8th Dist. Ct. App. 2008). The court concluded that, while evidence undeniably showed that dark mold stained the exterior siding of the insured's house, "the staining did not rise to the level of 'physical injury' to the siding, because it was only temporary and did not affect the structure of the wood." *Id.* at 41.  According to the *Mastellone* court,

> The term "physical injury" is undefined by the policy, so we give that term its usual meaning. *Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm*, 73 Ohio St.3d 107, 108, 652 N.E.2d 684. Read in context with the other terms used in the definition of "property damage," we construe the term "physical injury" to mean a harm to the property that adversely affects the structural integrity of the house. This interpretation is consistent with authorities on insurance law. *See, e.g.,* 10A Couch on Insurance (3d Ed.1998), Section 148:46 ("**The requirement that the loss be 'physical,' given the ordinary definition of that term, is widely held to exclude alleged losses that are intangible or incorporeal, and, thereby, to preclude any claim against the property insurer when the insured merely suffers a detrimental economic impact unaccompanied by a distinct, demonstrable, physical alteration of the property**"); *Comment, Why Fear the Fungus: Why Toxic Mold Is and Is Not the Next Big Toxic Tort* (2004), 52 Buff. L. Rev. 257, 276 (homeowners must show "distinct and demonstrable" damage to property as a result of mold growth, such as "clear physical damage to the structure of the home" to recover under a homeowner policy).

*Id.* at 41 (emphasis added).  The *Mastellone* court noted that its definition of "physical injury" comports with widely accepted insurance law authorities, including *Couch on Insurance*. *Id. Couch* underscored that the requirement a loss be "physical" excludes noncorporeal or intangible losses. *Id.*

Construing the term "physical injury" to require damage to the structural integrity of the house, the *Mastellone* court found that plaintiffs "presented no evidence to show that the mold on the siding of their house constituted 'physical damage' as that term is used in the policy." *Id.* at 42. According to the court, "[t]he presence of mold did not alter or otherwise affect the structural integrity of the siding." *Id.*  Therefore, the plaintiffs "failed to show that their house suffered any direct physical injury as required by the homeowners' policy." *Id.*

17

The Ohio Court of Appeals applied *Mastellone*'s definition of "physical injury" to require a harm that "adversely affects the structural integrity" of the insured property in two other cases.  In *Ohio Cas. Ins. Co. v. Hanna*, the court applied *Mastellone*'s reasoning to determine that property damage resulted when a builder constructed out-of-plumb and out-of-square walls and a crooked roof. *Ohio Cas. Ins. Co. v. Hanna*, Nos. 07CA0016-M, 07CA0017-M, 2008 WL 2581675, at *3 (Ohio 9th Dist. Ct. App. 2008).  According to the court, the builder's failure to squarely frame the house was a "physical injury" because the crooked walls and roof affected the structural integrity of the insured home.  *Id.* (citing *Mastellone*, 175 Ohio App. 3d at 40-41).  In *Cincinnati Ins. Cos. v. Motorists Mut. Ins. Co.*, when interpreting the undefined term "physical injury to tangible property," the court applied the definition from *Hanna* and *Mastellone*, that a physical injury is a "harm to the property that adversely affects the structural integrity of the house."  *Cincinnati Ins. Cos. v. Motorists Mut. Ins. Co.*, 18 N.E.3d 875, 882 n.5 (Ohio 9th Dist. Ct. App. 2014).

Further, as Acuity points out, the Sixth Circuit cited *Mastellone* with approval in *Universal Image Prods., Inc. v. Federal Ins. Co.*, 475 Fed. App'x 569, 573 (6th Cir. 2012).  In *Universal*, the insured leased office space that experienced a "significant odor consistent with microbial contamination."  *Id.* at 570.  Eventually, the odor and contamination grew to be so severe that the insured vacated the premises and filed a claim with its insurer for business disruption coverage.  The *Universal* policy—similar to the Property Coverage Form at issue here—provided threshold coverage for "direct physical loss or damage to" insured property.  *Id.* at 572.  Moreover, like the Property Coverage Form at issue here, the *Universal* policy did not define "direct physical loss or damage." *Id.*  The Sixth Circuit noted that, while Michigan case law offered little "insight into the meaning of the phrase 'direct physical loss or damage,'" the Michigan Court of Appeals indicated that it may

18

interpret "direct physical loss" to require tangible loss. *Id.* (citing *Acorn Investment Co. v. Michigan Basic Property Insurance Ass'n*, No. 284234, 2009 WL 2952677, at *1 (Mich. Ct. App. Sept. 15, 2009)). According to the Sixth Circuit, if Michigan indeed interpreted "direct physical loss" to require tangible loss, then coverage must be denied. *Id.* Citing *Mastellone*, the Sixth Circuit noted that Universal did not experience "tangible, physical losses, but economic losses" because Universal's landlord paid for all microbial remediation efforts and "not a single piece of Universal's **physical property** was **lost or damaged** as a result of mold or bacterial contamination." (Emphasis added.) *Id.* at 573. The Sixth Circuit concluded that, while Universal demonstrated that it suffered significant inconvenience from the persistent odor, it did not also suffer **tangible** damage. (Emphasis added.) *Id.* at 575 (noting that, "[m]ore importantly, no insured property was damaged or replaced as a result of odor").

In the instant case, Santo's does not allege that any physical force has altered or otherwise affected the property. Santo's does not allege anything that could be remotely considered "physical damage" as construed in *Mastellone*. Instead, Santo's alleges that the Closure Orders "mandated that Plaintiff's premises is unsafe, dangerous, and unfit for its intended use and therefore caused direct physical property damage or physical loss under the Policy." (Doc. No. 1-1, ¶ 31.) The Closure Orders simply did not create physical damage on Santo's premises. Santo's does not plead the existence of any physical force that destroyed, compromised, or injured Santo's property. There is no such physical force that rendered Santo's property unusable or inaccessible. The Closure Orders are not a physical intrusion on Santo's property.

Further bolstering the conclusion that Santo's must demonstrate some type of tangible physical alteration in order to claim coverage for a "direct physical loss of or damage to" its premises

is the Property Coverage Form's requirement that Santo's sustain loss of Business Income due to the "necessary suspension" of its "*operations* during the *period of restoration*."  (Doc. No. 7-7, PageID# 130.)   According to the Property Coverage Form, the "*period of restoration*" begins 24 hours after the "direct physical loss or damage" and ends on the date when the insured property "should be repaired, rebuilt, or replaced with reasonable speed and similar quality. . . ."  (*Id.* at PageID# 151.) The Court agrees with Acuity that construing "direct physical loss" or "direct physical damage" to cover intangible losses, such as the economic losses Santo's seeks to cover, would render large parts of the "*period of restoration*" definition nonsensical because intangible losses cannot be repaired, rebuilt, or replaced.  The "*period of restoration*" definition contemplates a definite length of time set aside for physical repairs to physical loss or damage.  (*See* Doc. No. 707, PageID# 151.)

Santo's also fails to point the Court towards any case applying Ohio law that supports its interpretation of the Property Coverage Form.   In its Opposition and Second through Fourth Supplemental Authorities[3], Santo's cites a bevy of cases from across the country.  Many of these

---

[3] In its Second Supplemental Authority, Santo's directs the Court to *Francois Inc. v. Cincinnati Ins. Co.*, a single-page order from the Lorain County Court of Common Pleas of Ohio.  (Doc. No. 17.)  There is just one single sentence in the entire order that addressed the parties' claims: "The complaint states claims which arguably fit the terms and conditions of the insurance policy and therefore the claims and defenses need to be developed with a record."  (Doc. No. 17-1.)  The court did not address any of the facts or policy language at issue in *Francois*, or explain its rationale for concluding that the defendant's motion should be dismissed.  (Doc. No. 17-1.)  The *Francois* order offers this Court no insight into how it should interpret the Property Coverage Form language at issue here.  In its Third Supplemental Authority, Santo's directs the Court to *Cajun Conti LLC, etc., D/B/A/ Oceana Grill v. Certain Underwriters at Lloyd's London*, a two-page trial court order from the Parish of Orleans.  (Doc. No. 19.)  The Court is not persuaded by this order.  In this order, the court concluded that there "is a genuine issue of material fact whether the policy interests here necessitate a more liberal reading of 'direct physical loss or damage' in keeping with the *Chinese Drywall* cases."  (Doc. No. 19-1, PageID# 411.) The court also concluded that there was a genuine issue of material fact whether the suspension of the plaintiff's restaurant operations "was caused by physical loss or damage to its property," but did not quote the provision in its entirety.  (*Id.*) Moreover, the *Cajun Conti* order does not purport to apply Ohio law.  (*Id.*)  Santo's offers no explanation as to how *Cajun Conti*'s reference to the Chinese Drywall cases and related public policy concerns are relevant to this Court's analysis of Santo's claims under Ohio law, particularly when the Ohio Court of Appeals already addressed the interpretation of physical loss in *Mastellone*.  *See supra*.  Finally, in its Fourth Supplemental Authority, Santo's discusses *JGB Vegas Retail Lessee, LLC v. Starr Surplus Lines Ins. Co.*, Case No. A-20-816628-B (Clark Cty. Dist. Ct.).  Again, this state trial court order does not purport to apply Ohio law.  (Doc. No. 21-2.)  Moreover, the trial court concluded that JGB pleaded a claim for direct physical loss or damage to its property because JGB alleged that it was highly likely that COVID-19 was present on its premises.  (*Id.* at PageID# 424.)  Santo's explicitly alleges that the Closure Orders, not the COVID-19

20

cases relate to certain states' more expansive definitions of the phrase "direct physical loss or damage" than the Ohio Court of Appeals stated in *Mastellone* and that the Sixth Circuit discussed in *Universal Image Prods*.  Generally, Santo's cited cases stand for the proposition that, absent a physical alteration, physical loss may still occur when a property is uninhabitable, substantially unusable for its intended purpose, or deprived of all functionality.  (*See, e.g.,* Doc. No. 13, PageID# 292-295.)  First and foremost, Santo's cited cases are not especially persuasive because they hail from a variety of states and do not purport to interpret Ohio law.  Rather, these states' interpretations of "direct physical loss or damage" are broader than Ohio's definition under *Mastellone*.  Second, Santo's offers little analysis as to why these cases are comparable to its present situation.  Instead, Santo's provides the Court with long string cites and parentheticals in hopes that the Court will fill in the blanks.  Third, even under other states' more expansive definitions of "direct physical loss or damage," Santo's allegations likely remain insufficient to state a claim.  For example, in *Motorists Mut. Ins. Co. v. Hardinger*, the homeowners alleged that they suffered a direct physical loss after e-coli bacteria in the property's well water rendered their home uninhabitable.  *Motorists Mut. Ins. Co. v. Hardinger*, 131 Fed. App'x 823 (3d Cir. 2005).  The homeowners' insurance policy did not define the term "direct physical loss."  *Id.* at 825.  The Third Circuit noted that no Pennsylvania Supreme Court case directly addressed whether total loss of use of an insured property constituted a physical loss.  *Id.* at 826.  However, the Third Circuit predicted that Pennsylvania courts would likely adopt the reasoning set forth in *Port Authority of New York and New Jersey v. Affiliated FM Ins. Co.*, in which the Third Circuit held that the proper standard for "physical loss or damage" to a structure is

---

virus itself, caused physical damage to Santo's premises.  (Doc. No. 1-1, ¶¶ 32-33.)  Finally, as discussed *infra*, this Court declines to follow the rationale set forth in *Studio 417, Inc. v. Cincinnati Ins. Co.*, No. 20-cv-03127, 2020 WL 4692385 (W.D. No. Aug. 12, 2020), and discussed in *JGB Vegas*.  (Doc. No. 21-2, PageID# 425.)

that a property's "function is nearly eliminated or destroyed, or the structure is made useless or uninhabitable" as a result of some kind of contamination. *Id.* at 826. Not only is this not the definition for "physical loss" set forth in Ohio case law, the Third Circuit's definition still requires some kind of physical "contamination" to "eliminate[] or destroy[]" the insured property's function. *Id.* Put simply, Santo's cited cases still require a physical force to act on the insured property for "physical loss or damage" to occur. Santo's alleges that the Closure Orders forced it to "cease its dine-in operations," but also permitted restaurants to remain open for carry-out orders. (Doc. No. 1-1, ¶¶ 1, 5.) As discussed above, the Closure Orders are not a physical force on Santo's property. Further, Santo's could remain open for carry-out orders during the height of the Closure Orders. No doubt, this is an undesirable and precarious position for a restaurant to find itself in, but it does not equate to physical damage as the Property Coverage Form requires.

The Court is also not persuaded by Santo's argument that "direct loss" must be read as a distinct trigger of coverage from "direct damage," such that "direct loss" cannot require physical "damage" lest we render "direct damage" mere surplusage. (Doc. No. 13, PageID# 290-91.) To support this argument, Santo's cites another COVID-19 insurance coverage dispute: *Studio 417, Inc. v. The Cincinnati Ins. Co.* (*Id.* at PageID# 297.) The court held that the plaintiffs adequately alleged a "direct physical loss" under their policies. *Studio 417, Inc. v. The Cincinnati Ins. Co.*, No. 20-cv-03127-SRB, 2020 WL 4692385, at *4 (W.D. Mo. Aug. 12, 2020). The *Studio 417* court read the policy to include two bases for coverage: "accidental physical loss *or* accidental physical damage." *Id.* at *5. According to the court, the defendant "conflate[d] 'loss' or 'damage' in support of its argument that the Policies require a tangible, physical alteration." *Id.* The court wrote that it must give meaning to both terms and that Eighth Circuit case law supported its reading that "physical loss"

was not synonymous with "physical damage." *Id.* (citing *Hampton Foods, Inc. v. Aetna Cas. & Sur. Co.*, 787 F.2d 349 (8th Cir. 1986), *Mehl v. The Travelers Home & Marine Ins. Co.*, Case No. 16-CV-1325-CDP, 2018 U.S. Dist. LEXIS 74552 (E.D. Mo. May 2, 2018)).

However, the *Studio 417* court also noted that, "[t]o be sure, and as argued by Defendant, there is case law in support of its position that physical tangible alteration is required to show a 'physical loss.'" *Id.* The *Studio 417* court is correct that case law exists to support that "physical loss" requires tangible alteration—case law from this state and the Sixth Circuit construes "physical loss" to require some kind of tangible alteration. The Sixth Circuit, in *Universal Image Prods.*, interpreted "direct physical loss or damage" to require "tangible damage." *Universal Image Prods.*, 475 Fed. App'x at 573. In arriving at its interpretation, the Sixth Circuit quoted *Mastellone*'s requirement that "physical injury" requires harm that affects the structural integrity of the insured premises. *Id.* Accordingly, *Studio 417*'s interpretation of certain Eighth Circuit case law is not helpful to the dispute at hand, which requires this Court to apply Ohio law. *See also, e.g., Turek Enterp. Inc. v. State Farm Mut. Auto. Ins. Co.*, No. 20-11655, --- Fed. Supp. 3d ---, 2020 WL 5258484, at *5 (E.D. Mich. Sept. 3, 2020) (relying on *Universal Image Prods.*'s definition of "direct physical loss" to conclude that "accidental direct physical loss" unambiguously requires that plaintiff demonstrate tangible damage to insured property in COVID-19 insurance coverage dispute); *Bethel Vill. Condo. Ass'n v. Republic-Franklin Ins. Co.*, No. 06AP-691, 2007 WL 416693, at *4 (Ohio 10th Dist. Ct. App. Feb. 8, 2007) (concluding that appellant interpretation of "direct physical loss or damage" as disjunctive was unreasonable because the appellee-insurer did not agree to insure appellant against appellee's own decision to deny coverage for casualty loss).

Santo's also argues that Acuity's discussion of *Mastellone* is confusing because "the very specific language analyzed in *Mastellone*" is not "the same as the language" in Acuity's Policy.  (Doc. No. 13, PageID# 291.)  However, Santo's does not identify the "very specific language" in *Mastellone* that it believes to be inapposite to the Property Coverage Form at issue.  The Court notes that the *Mastellone* court interpreted the phrase "physical injury," rather than the phrase in Acuity's Property Coverage Form, "physical loss of or damage to" insured premises.  To the extent that Santo's suggests that physical *injury* is different from physical *loss or damage*, the Court finds that such an argument is unpersuasive and misses the mark.  The *Mastellone* court interpreted the plain meaning of the phrase "physical injury" within the context of other terms used in the policy's definition of "property damage."  *Mastellone*, 175 Ohio App. 3d at 40.  In so doing, the court determined that "physical injury" meant harm that affects the structural integrity of the insured premises and that this interpretation comported with insurance-law authorities' explanation that a "physical" injury must have a tangible impact on the premises and that intangible or incorporeal losses are excluded.  *Id.* at 41 ("The requirement that the loss be 'physical,' given the ordinary definition of that term, is widely held to exclude alleged losses that are intangible or incorporeal, and, thereby, to preclude any claim against the property insurer when the insured merely suffers a detrimental economic impact unaccompanied by a distinct, demonstrable, physical alteration of the property.")  "Physical" damage excludes mere economic effects, like the ones that Santo's pleaded here.  *Id.*

Threshold coverage for Business Income and Extra Expense losses requires "direct physical loss of or damage to" insured property.  (Doc. No. 7-7, PageID# 130.)  Ohio law construes "direct physical loss of or damage to" insured property to require that the plaintiff-insured plead distinct, demonstrable, physical alteration of the insured property.  *See, e.g., Mastellone*, 175 Ohio App. 3d at

24

40.  Accepting the factual allegations in Santo's Complaint as true, Santo's fails to plead any physical alteration of its insured property.[4]  Accordingly, Santo's fails to meet the threshold for Business Income and Extra Expense coverage under the Acuity Property Coverage Form.

### 3.    Threshold Claim for Civil Authority Coverage

The parties dispute whether Santo's adequately pleads a threshold claim for coverage under the Policy's Civil Authority provision.

Acuity argues that Santo's fails to make a threshold claim for Civil Authority coverage because Santo's does not allege a physical loss as required under the Policy.  (Doc. No. 7-1, PageID# 54.)  Further, Acuity attacks the sufficiency of Santo's allegations with respect to Civil Authority coverage.  (Doc. No. 7-1, PageID# 54-55.)  Acuity argues that Santo's does not plead that COVID-19 was present on a specific property within Santo's vicinity, nor that any other property in its vicinity sustained physical damage.  (*Id.*)  Acuity argues that Santo's does not allege that any civil authority prohibited access to its property "because of a dangerous physical condition in a surrounding property."  (*Id.*)  Further, Acuity argues, Santo's does not make any plausible allegation "that a civil authority prohibited access to" Santo's restaurant because Santo's was not completely prohibited from accessing its premises.  Finally, Acuity argues that there is an insufficient causal nexus between the Closure Orders and Santo's alleged "damage," because the order was issued to prevent person-to-person spread of the virus, not in response to physical damage.  (*Id.*)

---

[4] The Court is not persuaded by Santo's argument that Acuity's Motion to Dismiss is "crafted in the nature of a Motion for Summary Judgment." (Doc. No. 13, PageID# 281.) No amount of the discovery that Santo's calls for in its Opposition and accompanying exhibit would remedy the fundamental problem in Santo's Complaint: that it fails to plausibly allege physical loss or damage that meets the coverage threshold under the Property Coverage Form. (*See* Doc. No. 13, PageID# 281-84; *see also* Doc. No. 13-1.)

Santo's counters by arguing that its business is clearly affected by the Closure Orders and that the State issued the Closure Orders because COVID-19 was present throughout Ohio and Medina County.  (Doc. No. 13, PageID# 295.)  Further, Santo's argues that whether Santo's or other nearby properties suffered physical loss or damage is a question of fact, not law, and not suited for determination at the pleadings stage.  (*Id.* at PageID# 296.)

The Court finds that Santo's fails to plead a threshold claim for Civil Authority Coverage. The Court again begins its analysis by examining the language of the Policy.  First, the Civil Authority provision states that it applies when a "Covered Cause of Loss causes damage to a property *other* than property" at the insured's premises.  (Doc. No. 7-7, PageID# 131.)  The Property Coverage Form defines "Covered Causes of Loss" as "Risks of Direct Physical Loss unless the loss is" either excluded under Property Exclusions or subject to certain Policy limitations.  (*Id.* at PageID# 127.)  The Property Coverage Form does not define the term "direct physical loss."  However, as discussed *supra*, Ohio courts construe "direct physical loss" to require the insured to demonstrate distinct, demonstrable, physical alteration of the insured property.  *See, e.g., Mastellone*, 175 Ohio App. 3d at 40.  Therefore, to make a threshold claim for Civil Authority Coverage, Santo's must allege that another property sustained a direct physical loss, such that the other property experienced distinct, demonstrable, physical alteration.  The Court agrees with Acuity that Santo's makes no such allegation here.  As discussed above, Santo's allegation that the Closure Orders rendered its premises "unsafe, dangerous and unfit for its intended use and therefore caused direct physical property damage or physical loss under the Policy" is inaccurate.  (Doc. No. 1-1, ¶ 31.)  The Closure Orders did not exact physical damage that demonstrably altered Santo's premises.  Moreover, the Civil Authority provision

26

requires that Santo's identify a building *other* than its own that sustained direct physical loss.  Santo's does not do so.

Further, Santo's also fails to allege that a civil authority fully prohibited access to its premises.  In *Penton Media, Inc. v. Affiliated FM Ins. Co.*, another court in this district noted that "'civil authority, when contained in an insurance policy, refers to the situation when a civil authority prohibits access to the insured's premises resulting in a *total loss* of business income.'"  *Penton Media, Inc.*, 2005 WL 8171363, at *9 (emphasis added) (quoting *New York Career Institute v. Hanover Ins. Co.*, 791 N.Y.S.2d 338, 342 (N.Y. Sup. Ct. Jan. 4, 2005)).  Santo's alleges that the Closure Orders "prohibit access to Plaintiff's premises, thereby causing the necessary *suspension of Plaintiff's dine-in business operations* and triggering the Civil Authority coverage under the Policy." ((Emphasis added.) *Id.* at ¶ 32.)  On the face of Santo's own Complaint, Santo's does not allege that it was utterly prohibited from accessing its premises, only that the Closure Orders prohibited Santo's from conducting dine-in operations.  (*Id.*)  Santo's does not allege that it was prohibited from accessing its premises for the purpose of filling take-out, delivery, and catering orders.  (*Id.* at ¶¶ 1, 32.)  In other words, while the State's Closure Orders prevented Santo's from conducting dine-in operations—Santo's primary source of income—the Closure Orders did not prevent Santo's from accessing its premises altogether.  Accordingly, for the reasons above, the Court finds that Santo's fails to meet the threshold for Civil Authority coverage under the Acuity Property Coverage Form.

### 4.    Virus Exclusion

Assuming *arguendo* that Santo's Complaint alleges plausible claims for coverage, the parties dispute whether such coverage nevertheless would be excluded by the Property Coverage Form's virus exclusion.

27

Acuity argues that, even if Santo's alleges plausible claims for coverage here, such coverage would be excluded by the Property Coverage Form's virus exclusion.  (Doc. No. 7-1, PageID# 56.) Under the Property Coverage Form, coverage under the Business Income and Extra Expense or Civil Authority provisions is premised on the existence of a Covered Cause of Loss.  (*Id*.)  According to Acuity, a Covered Cause of Loss "means a risk of direct physical loss unless the loss is excluded or limited elsewhere in the policy."  (*Id*.)  The Property Coverage Form's "Property Exclusions" excludes coverage for "loss or damage caused directly or indirectly by . . . [a]ny virus . . . that induces or is capable of inducing physical distress, illness or disease."  (*Id.*; *see also* Doc. No. 7-7, PageID# 139-40.)  According to Acuity, such loss or damage is excluded "regardless of any other cause or event that contributes concurrently or in any sequence to the loss."  (Doc. No. 7-1, PageID# 56.) Acuity argues that Santo's "ultimate allegation" is that "the Acuity policy 'covers losses caused by the COVID-19 infection which is a global pandemic.'"  (*Id.* (quoting Doc. No. 1-1, ¶ 24.).)  Acuity argues that Santo's allegations "fall squarely within" the virus exclusion because COVID-19 is a disease caused by a virus and the Property Coverage Form excludes coverage for loss or damage caused directly or indirectly by a virus.  (*Id.* at PageID# 57.)  Further, Acuity argues that the Anti-Concurrent Causation Clause bars coverage of Santo's claims because the State of Ohio only issued its Closure Orders in response to community spread of the COVID-19 virus.  (*Id.* at PageID# 57-58.)

In its Opposition, Santo's responds that the virus exclusion is ambiguous.  Santo's argues that Acuity cannot prove that the virus exclusion applies here because the virus exclusion does not clearly "exclude losses as a result of Closure Orders due to a pandemic."  (Doc. No. 13, PageID# 286.) Because exclusions must be construed against the insurer and any ambiguities resolved in favor of the insured, Santo's argues, the ambiguity in the virus exclusion "inures to the benefit" of Santo's.

(*Id.*)  Moreover, Santo's emphasizes that the Closure Orders—not the COVID-19 virus—caused Santo's business losses, not the COVID-19 virus.  (*Id.*)  Therefore, the virus exclusion is "subject to more than one reasonable interpretation" because Santo's pleaded losses as a result of the Closure Orders, not a virus.  (*Id.* at PageID# 287.)  According to Santo's, Acuity attempts to impermissibly extend the virus exclusion "to apply to a claim based on damage caused by orders of a civil authority." (*Id.*)  Santo's argues that Acuity's interpretation of the virus exclusion is "limitless and would produce absurd results."  (*Id.*)

Santo's also argues that the virus exclusion is ambiguous and does not clearly preclude coverage because the virus exclusion does not mention a "pandemic."  (*Id.* at PageID# 288.)  Santo's argues that the absence of pandemic-related language renders the exclusion ambiguous as to whether it applies to a pandemic.  (*Id.*)

Finally, Santo's responds that Acuity's argument that the Property Coverage Form excludes loss or damage caused directly as well as indirectly by a virus is insufficient.  (*Id.* at PageID# 288-89.)  Santo's reemphasizes that the Closure Orders—not the virus—"caused its losses, full stop." (*Id.* at PageID# 289.)  Santo's argues that this should be sufficient at the pleading stage.  (*Id.*)

In its Reply, Acuity argues that Santo's Complaint "concedes the obvious, which is that this lawsuit would never have been filed absent the existence of the COVID-19 virus."  (Doc. No. 14, PageID# 372.)  Acuity responds that, even if the virus did not "directly restrict Plaintiff's dine-in operations, it did so indirectly by triggering the governmental orders."  ((Emphasis added.) *Id.*) Acuity argues that the virus exclusion applies whether the virus causes loss or damage directly or indirectly, and regardless of any other cause or event that contributes concurrently or in any sequence to the loss.  (*Id.*)  Acuity also argues that Santo's final argument, that the virus exclusion is ambiguous

and does not address a pandemic, fails because Santo's does not identify an ambiguity in the virus

exclusion.  (*Id.*)  Acuity argues that Santo's distinction between a "virus" and a "pandemic" is not a

distinction at all because "the current pandemic is a widespread outbreak of disease caused by the

COVID-19 virus."  (*Id.*)  The Court agrees with Acuity.

Even assuming *arguendo* that Santo's alleged a plausible claim for coverage under the

Business Income and Extra Expense or Civil Authority provisions, the Court concludes that coverage

would still be excluded by the Property Coverage Form's virus exclusion.  Once again, the Court

begins with the language of the Property Coverage Form.  As discussed *supra*, "Covered Causes of

Loss" include "Risks of Direct Physical Loss unless the loss is: a. Excluded in Property Exclusions;

or b. Limited in paragraph 4, Limitations; that follow."  (Doc. No. 7-7, PageID# 127.)  By its plain

language, the "Property Exclusions" provision excludes coverage "for loss or damage caused directly

or indirectly" that would not have occurred but for "[a]ny virus, bacterium or other microorganism

that induces or is capable of inducing physical distress, illness or disease," among other exclusions.

(*Id.* at PageID# 139-40.)

Santo's argument that it suffered losses as a result of the Closure Orders and not the COVID-

19 virus is unpersuasive.  (Doc. No. 13, PageID# 289.)  Indeed, Santo's own Complaint refutes its

argument.  In its Complaint, Santo's alleges that the State of Ohio issued its Closure Orders "[i]n

response to the pandemic, and the community spread of COVID-19 in Ohio . . . ."  (Doc. No. 1-1, ¶

29.)  Santo's alleges that the "continuous presence of the pandemic and COVID-19 contagion,

resulted in the Closure Orders . . . ."  (*Id.* at ¶ 31.)  Therefore, Santo's concedes or acknowledges that

but for the presence and community spread of the COVID-19 virus throughout Ohio, the State of

Ohio would not have issued its Closure Orders.

Further, Santo's argument that it suffered losses only because of the Closure Orders and not the COVID-19 virus ignores the Anti-Concurrent Causation Clause in the beginning of the Property Exclusions provision:

> We will not pay for loss or damage caused directly or indirectly by any of the following. **Such loss or damage is excluded regardless of any other cause of event that contributes concurrently or in any sequence to the loss.**  These exclusions apply whether or not the loss event results in widespread damage or affects a substantial area.

((Emphasis added.) Doc. No. 7-7, PageID# 139.)  Contrary to Santo's argument that applying the virus exclusion to its Closure Order-related claims produces "absurd results," the result here is dictated precisely by the plain language of the Property Exclusions provision.[5]  (Doc. No. 13, PageID# 287.)  The plain language of the Property Coverage Form's virus exclusion excludes "[a]ny virus . . . that induces or is capable of inducing physical distress, illness or disease."  (Doc. No. 7-7, PageID# 140.)  COVID-19 is a highly contagious virus that is capable of inducing "physical distress, illness or disease."  (Doc. No. 7-7, PageID# 140.)  Under the plain language of the Property Exclusions's Anti-Concurrent Causation Clause, this virus exclusion extends to exclude coverage for any "loss or damage" where a virus is part of the causal chain of loss or damage.  (*Id.*)  The State issued its Closure Orders in direct response to the community spread of the COVID-19 virus in Ohio.

---

[5] Santo's cites to *Pipefitters Welfare Educ. Fund* to support its argument that Acuity's interpretation of the virus exclusion clause is "limitless and would produce absurd results."  (Doc. No. 13, PageID# 287.)  However, *Pipefitters* addresses a different scenario than the one at bar, namely, how to interpret a pollution exclusion clause, rather than a virus exclusion clause.  (*Id.*)  In *Pipefitters*, the policy defined "Pollutants" as "any solid, liquid, gaseous, or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste."  *Pipefitters Welfare Educ. Fund v. Westchester Fire Ins. Co.*, 976 F.3d 1037, 1043 (7th Cir. 1992).  The court noted that policy terms like "irritant" and "contaminant," "when viewed in isolation," are "virtually boundless" and offered two simple examples to illustrate how a broad reading of "irritant" might lead to "absurd results."  *Id.*  For example, an individual could sustain bodily injury when he slips on a spilled bottle of Drano, or when he suffers an allergic reaction to chlorine in a public pool.  *Id.*  In these hypotheticals, both Drano and chlorine are irritants that caused bodily injury, but, as the Seventh Circuit noted, "one would not ordinarily characterize these events as pollution."  *Id.*  However, Santo's does not explain how applying the virus exclusion to claims involving the COVID-19 *virus* is an overbroad or absurd interpretation of the virus exclusion.

31

Thus, Santo's coverage claims are excluded because its "loss or damage" resulted from the Closure Orders, a direct result of COVID-19's community spread across Ohio.

Moreover, Santo's contention that COVID-19 is a "pandemic" and not a "virus" is unavailing. The plain language of the virus exclusion excludes coverage for loss or damage that results from a virus "that induces or is capable of inducing physical distress, illness or disease."  (Doc. No. 7-7, PageID# 140.)  The COVID-19 virus can significant illness or disease.  (*Id.*)  As Santo's cites in its own Opposition, Merriam-Webster defines a "pandemic" as "an outbreak of a *disease* that occurs over a wide geographic area (such as multiple countries or continents) and typically affects a significant proportion of the population**:** a pandemic outbreak of a *disease* . . . ."  *Pandemic*, *Merriam-Webster*,  https://www.merriam-webster.com/dictionary/pandemic  (last visited  Dec.  16,  2020) (emphasis added).  (*See also* Doc. No. 13, PageID# 288.)  Thus, to refer to COVID-19 as a "pandemic" is to refer to the worldwide outbreak and spread of the disease caused by the COVID-19 *virus*.  By the Property Coverage Form's own terms, claims for loss or damage resulting from viruses are excluded.

The Court concludes that no ambiguity exists in the Property Coverage Form's virus exclusion.  "[W]here an exclusionary in an insurance contract is unambiguous, Ohio law requires that the plain language of the clause be given effect."  *Scott v. Allstate Indem. Co.*, 417 F. Supp. 2d 929, 933 (N.D. Ohio 2006).  Accordingly, the Court concludes that, even if Santo's plausibly alleged claims for COVID-19-related losses, coverage would be excluded under the Property Coverage Form's virus exclusion.

### 5.      Bad-Faith and Waiver

In its Motion to Dismiss, Acuity argues that Santo's Bad Faith claim in Count III fails as a matter of law because any denial of coverage by Acuity was not only reasonably justified, but "was entirely correct."  (Doc. No. 7-1, PageID# 59.)  Separately, Acuity also argues that Santo's cannot invoke the doctrine of "waiver" to create coverage where none exists.  (*Id.*)  Because none of Santo's claims meet the threshold for coverage under the Property Coverage Form, Acuity argues that Santo's may not attempt to expand coverage of the Property Coverage Form by arguing waiver.  (*Id.* at PageID# 60.)  Santo's did not respond to Acuity's arguments with respect to either bad faith or waiver in its Opposition.  The Court finds that Santo's does not oppose Acuity's motion with respect to these claims.  *Lewis v. Cleveland Clinic Found.*, 1:12-cv-3003, 2013 WL 6199592, at *4 (N.D. Ohio Nov. 27, 2013) ("It is well understood . . . that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded." (internal quotations omitted)); *see also Garmou v. Kondaur Cap. Corp.*, No. 15-12161, 2016 WL 3549356 at *7 (E.D. Mich. June 30, 2016) (finding that plaintiff conceded claims after failing to respond to defendants' arguments for dismissal of multiple claims).

## III.     Conclusion

The Court finds that Santo's fails to plausibly allege claims that meet the Property Coverage Form's threshold coverage requirements under either the Business Income and Extra Expense or Civil Authority Provisions.  For the reasons set forth above, Acuity's Motion to Dismiss (Doc. No. 7) is GRANTED.

**IT IS SO ORDERED.**

33

 *s/Pamela A. Barker*
                  PAMELA A. BARKER

Date:  December 21, 2020         U. S. DISTRICT JUDGE